UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE KITTANSETT CLUB, and STEPHEN F. GORMLEY,<br><br>Plaintiffs,<br><br>v.<br><br>PHILADELPHIA INDEMNITY INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 11-11385-DJC |

## MEMORANDUM AND ORDER

**Casper, J.**                                                                                           September 10, 2012

### I.     Introduction

Plaintiffs The Kittansett Club ("Kittansett") and Stephen F. Gormley (collectively, the "Insureds"), brought this action against Defendant Philadelphia Indemnity Insurance Company ("PIIC") to determine the parties' respective rights and obligations under an insurance policy issued by PIIC to the Insureds. Before the Court is the Insureds' motion for partial summary judgment as to Count I (declaratory judgment) and Count II (breach of contract) and PIIC's motion for summary judgment on all counts. For the reasons set forth below, the Insureds' motion for partial summary judgment is DENIED and PIIC's motion for summary judgment is GRANTED.

### II.    Burden of Proof and Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. FED. R.

1

CIV. P. 56(a). The moving party must show the basis for its motion and demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmovant "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)); ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). When "presented with cross-motions for summary judgment, [the Court] 'must view each motion separately,' in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012) (quoting Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010)). The interpretation of an insurance policy is a question of law for the court and appropriately decided on summary judgment. Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012).

## III. Factual Background

Kittansett is a golf club in Marion, Massachusetts and is a Massachusetts not-for-profit corporation. Compl., D.[1] 1-1 at ¶ 2. Stephen Gormley was a past officer of Kittansett. Compl., D. 1-1 at ¶ 3. PIIC is a Pennsylvania insurance company. Compl., D. 1-1 at ¶ 4, PIIC Answer, D. 7 at ¶ 4. PIIC issued a "Flexi Plus Five" insurance policy (the "Policy") to the Insureds effective from March 24, 2009 through March 24, 2010. Policy, D. 16-5 at 7, 22. The Policy contains Directors & Officers Liability Insurance and Employment Practices Liability Insurance, which provide coverage for the Insureds in relevant part, as follows:

---

[1] References to the docket are abbreviated as "D. ___."

2

## Part 1
Not-for-Profit Organization Directors & Officers Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Organization** has indemnified the **Individual Insureds** for such **Loss**.

B. The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against Individual Insureds during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Organization** has indemnified such **Individual Insureds** for such **Loss**.

C. The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II. DEFINITIONS

A. A **D&O Wrongful Act** means any actual or alleged:

1. act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or by the **Organization** . . .
However, **D&O Wrongful Act** does not include an **Employment Practice Act**, **Fiduciary Liability Act**, or **Internet Liability Act**.

Policy, D. 16-5 at 22 (all emphasis in original).

**Part 2**
Employment Practices Liability Insurance
(To be read in conjunction with the Common Policy Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practices Act**.

II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:
. . .
2. breach of a written or oral employment contract or implied employment contract;
. . .
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

Policy, D. 16-5 at 23–24 (all emphasis in original).

**Part 6**
Common Policy Definitions

. . .

C. **Damage** means a monetary judgment, award or settlement including punitive, exemplary or multiple portion thereof. . .

D. **Defense Cost** means:
1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim** . . .
. . .

I. **Loss** means:
1. **Damages**;
2. **Defense Cost**;

4

> but **Loss** does not include:
> 1. criminal or civil fines or penalties imposed by law. . .

Policy, D. 16-5 at 29–30 (all emphasis in original).

**Amendment of Exclusions**

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

With regards to Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and the amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for retaliation; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deduction taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)** including, but not limited to, (I) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B., is replaced by:

B.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or

inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deduction taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)** including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 6 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

Policy, D. 16-5 at 42 (all emphasis in original).

On April 8, 2009, Charles Cotter, on behalf of himself and other servers and bartenders at Kittansett (the "Cotter Plaintiffs"), filed a complaint (the "Cotter Complaint") against the Insureds in Plymouth Superior Court for their alleged "failure to distribute the full proceeds of gratuities to [Kittansett's] employees as required by law." Cotter Compl., D. 16-1 at ¶ 1. According to the Cotter Complaint, Kittansett typically added an 18% gratuity to food and beverage bills. Cotter Compl., D. 16-1 at ¶¶ 8. The Cotter Plaintiffs alleged that the Insureds did not "remit the proceeds of this gratuity to employees who serve the food or beverage," and that instead Kittansett had "a policy and practice of retaining the gratuity for itself and/or distributing it to management or other employees who d[id] not serve food or beverages." Cotter Compl., D. 16-1 at ¶¶ 9–10. Therefore, the Cotter Plaintiffs argued that the Insureds' conduct constituted a violation of MASS. GEN. L. c. 149, § 152A, breach of an implied contract, interference with contractual and/or advantageous relations and quantum meruit/unjust enrichment. Cotter Compl., D. 16-1 at ¶ 1. The Insureds subsequently settled the Cotter action. Pl. SOF, D. 16 at ¶ 5; Def. SOF, D. 21 at ¶ 5. PIIC notified Kittansett by letter on July 27, 2009 and again on January 11, 2010, in response to further demand from the Insureds that the insurer provide a defense and indemnification for the suit filed by the

Cotter Plaintiffs, that it would not provide coverage under the Policy for the claims raised in the Cotter Complaint. D. 16-2; D. 16-4.

IV.     **Procedural History**

The Insureds initiated this lawsuit on July 19, 2011 in Suffolk Superior Court seeking declaratory judgment (Count I) and asserting claims for breach of contract (Count II) and violation of MASS. GEN. L. c. 93A (Count III). PIIC removed the case to this Court on August 3, 2011. The Insureds have moved for partial summary judgment on Counts I–II and, in opposition to that motion, PIIC cross-moved for summary judgment on Counts I–III. After a hearing on both motions on July 2, 2012, the Court took the matter under advisement.

V.      **Discussion**

    A.     **The Parties' Cross-Motions for Summary Judgment on Counts I and II**

The parties dispute whether the Insureds are entitled to coverage for the claims raised and settled in the Cotter action. For coverage under the Policy, there must be "Loss from Claims made against [the Insureds] . . . for D&O Wrongful Acts." Policy, D. 16-5 at 22.[2] Accordingly, whether PIIC must defend and indemnify the Insureds turns upon three issues: (1) whether the Insureds suffered a "Loss" as defined under the Policy; (2) whether the Insureds suffered that Loss as a result of a D&O Wrongful Act or rather as the result of a pre-existing duty; and (3) whether the

---

[2] Although the Loss must be from Claims made against the Insureds during "the Policy Period" (here, March 24, 2009 to March 24, 2010) and must be reported to PIIC pursuant to the terms of the Policy for the Loss to be covered under the Policy, PIIC does not for the purposes of opposing the Insureds' motion for summary judgment or cross-moving for summary judgment argue that these two conditions are not met here. Moreover, based upon the undisputed record before the Court, they are met here where the Cotter Complaint was filed in April 2009 and there is no suggestion that the Insureds did not contact PIIC pursuant to Part 8, section IV of the Policy, D. 16-5 at 34, where they notified PIIC sometime before July 27, 2009, Pl. SOF, D. 16 at ¶ 6, and again on November 4, 2009. Pl. SOF, D. 16 at ¶ 8.

7

Amendment of Exclusions Endorsement precludes coverage under the Policy because it excludes claims for failure to pay "Earned Wages."

### 1. *"D&O Wrongful Act" Includes the Conduct Alleged in the Cotter Complaint*

The parties dispute whether the Insureds' conduct as alleged in the Cotter Complaint falls within the Policy's definition of a "D&O Wrongful Act" and thus is covered by the Policy. "The interpretation of an insurance policy is a matter of law." Certain Interested Underwriters at Lloyd's, London v. Stolberg, 680 F.3d 61, 65 (1st Cir. 2012). The parties do not dispute that Massachusetts law governs the interpretation of this contract. Pl. Mem., D. 17 at 9; Def. Opp., D. 20 at 4*;* see Bird v. Centennial Ins. Co., 11 F.3d 228, 231 n.5 (1st Cir. 1993). "Under Massachusetts law, [courts] construe an insurance policy under the general rules of contract interpretation. [Courts] begin with the actual language of the policies, given its plain and ordinary meaning." Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000).

Here, the Policy defines a "D&O Wrongful Act" as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, breach of duty. . . committed . . . by an Individual Insured in his/her capacity as an Individual Insured; or by the Organization." Policy, D. 16-5 at 22. The allegations in the Cotter Complaint encompass both an omission and an act. Paragraph 9 of the Cotter Complaint alleges that "[the Insureds did] not remit the proceeds of [the 18% gratuity on food and beverage] to employees who serve the food or beverages." Cotter Compl., D. 16-1 at ¶ 9. Specifically, the Cotter Complaint alleges that the Insureds ought to have paid gratuities to their employees but failed to do so, and that this omission provides the basis for liability. The Cotter Complaint further alleges that the Insureds "retain[ed] the gratuity for itself and/or distribut[ed] it to management or other employees who do not serve food or beverages."

8

Cotter Compl., D. 16-1 at ¶ 10.  That is, the Cotter Complaint alleges that the Insureds acted by retaining or improperly distributing the gratuities and that this action provides the basis for liability. Therefore, the conduct alleged by the Cotter Complaint falls within the "plain and ordinary" meaning of the language set forth in the Policy.

Even so, PIIC argues that a violation of a preexisting statutory duty cannot constitute a "wrongful act" for the purposes of the Policy.  But, in so doing, PIIC conflates the scope of the term "wrongful act" and the separate issue of whether the settlement of the Cotter Complaint amounts to a loss caused by a wrongful act under the Policy.  In <u>Republic Franklin Insurance Co. v. Albemarle County School Board</u>, 670 F.3d 563 (4th Cir. 2012), the Fourth Circuit reversed a district court ruling for an insurer that had failed to defend or indemnify a school district against a FLSA complaint for unpaid wages and overtime pay.  The court rejected the argument that there was no wrongful act on the grounds that the insured had a pre-existing statutory duty to pay the wages, since such an interpretation "would not only be incompatible with the definition of 'wrongful act' in such policies . . . but also is counterintuitive because no violation of the law could ever be a 'wrongful' act as there would always be a preexisting duty to follow the law."  <u>Id.</u> at 567–68.  "<u>Every</u> duty breached or violated is necessarily a preexisting duty, and it is the <u>breach</u> or <u>violation</u> of that duty which constitutes a wrongful act."  <u>Id.</u> at 566 (emphasis in original).  The Court finds this analysis persuasive.  Accordingly, the Insureds' conduct as alleged in the Cotter Complaint does fall within the Policy's definition of a "D&O Wrongful Act."  To conclude that the conduct alleged in the Cotter Complaint amounts to a "D&O Wrongful Act" does not, however, allow the Insureds to ignore their statutory obligations by shifting costs to their insurer because, as discussed below, the Court finds that the resulting Loss, at least in part, was not "for" the D&O Wrongful Act as required

9

for coverage under the Policy.

> 2.  *Restitution of Gratuities Does Not Constitute a Loss from Claims for a D&O Wrongful Act*

Next, the parties contest whether the Insureds suffered a "Loss from Claims . . . for D&O Wrongful Acts," which is required for PIIC to be held liable under the Policy. Policy, D. 16-5 at 22. "Loss" is defined in relevant part as "Damages" and "Defense Costs," but does not include "criminal civil fines or penalties imposed by law." Policy, D. 16-5 at 30. "Damages" are defined as "a monetary judgment, award or settlement including punitive, exemplary or multiple portion thereof." Policy, D. 16-5 at 29. Here, there is no dispute that the Cotter action never proceeded to trial and was resolved by settlement of the parties. Pl. SOF, D. 16 at ¶ 5; Def. SOF, D. 21 at ¶ 5. The Policy explicitly states that a settlement is included in the definition of "Damages" and thus of "Loss." Even so, PIIC argues that the Cotter Plaintiffs sought restitution, injunctive relief, liquidated damages and attorney's fees pursuant to MASS. GEN. L. c. 149, § 152A, which should not be included in the Policy's definition of "Loss." Def. Br., D. 20 at 10–13. PIIC further argues that even if the remedies sought and recovered in the form of a monetary settlement fall within the meaning of "Loss" under the Policy, that "Loss" was not as a result of a D&O Wrongful Act, but rather of the Insureds' pre-existing statutory duty.

The Fourth Circuit's analysis in Republic Franklin is instructive on this latter point as well. The Fourth Circuit explained that while a breach of a statutory duty, such as a duty to pay wages, may constitute a "wrongful act," the resulting obligation to pay back wages may not be a loss <u>arising from</u> that wrongful act because the obligation to pay arose from the statute and predated the wrongful act. 670 F.3d at 567. The Fourth Circuit relied on Pacific Insurance Co. v. Eaton Vance Management, 369 F.3d 584 (1st Cir. 2004); May Department Stores v. Federal Insurance Co., 305

F.3d 597 (7th Cir. 2002); and Oktibbeha County School District v. Coregis Insurance Co., 173 F. Supp. 2d 541 (N.D. Miss. 2001), which:

> stand for the proposition that a judgment ordering an insured to pay money that the insured was already obligated to pay, either by contract or statute, is not a 'loss' covered under an insurance policy that requires that the loss be caused by a 'wrongful act.' The alleged 'loss' in such cases arises from the contract or the statute itself; not from the failure to abide by it.

Republic Franklin, 670 F.3d at 567.

In Pacific Insurance, the First Circuit held that an employer's insurance policy, which covered losses incurred "by reason of" a breach of the employer's duties under ERISA, did not cover amounts paid by the employer to replace deficiencies in its employees' profit-sharing accounts. See Pacific Ins., 369 F.3d at 586–87. Reading "by reason of" to mean "because of," the court found that the employer's deficiency payments were not made because of any breach of its duties under ERISA; rather, they were made because of the preexisting duty under the employer's profit-sharing plan to make the payments. Id. at 590. Because the employer sought "reimbursement for amounts it paid . . . in satisfaction of its [Profit Sharing] Plan-created obligation to establish and fund those [employee] accounts to the level they would have attained had [the employer] initially complied with the Plan," the payments were made not because of the breach of any duty but rather because of the obligations created by the profit-sharing plan itself. Id.; see also Oktibbeha Cnty. Sch. Dist., 173 F. Supp. 2d at 543 (concluding that "[t]he school district had a duty to pay overtime compensation because of the statutory requirements of the [FLSA], not because of any wrongful act or omission of the school district"). Agreeing with May Department Stores, Pacific Insurance stands for the proposition that allowing insureds to shift costs to their insurers merely by breaching existing obligations would create perverse incentives. See Pacific Ins., 369 F.3d at 593 (citing May Dep't

11

Stores, 305 F.3d at 601 (concluding that "[i]t would be passing strange for an insurance company to insure a pension plan (and its sponsor) against an underpayment of benefits, not only because of the enormous and unpredictable liability to which a claim for benefits on behalf of participants in or beneficiaries of a pension plan of a major employer could give rise, but also because of the acute moral hazard problem that such coverage would create")).

These authorities make clear that a loss from a claim for a wrongful act in breach of a preexisting duty "could only arise if the failure to fulfill the preexisting duty to pay wages caused 'damages' apart from the back wages not paid." Republic Franklin, 670 F.3d at 567 (emphasis in original) (citing Pac. Ins., 369 F.3d at 590–91). Thus, while restitution payments made to fulfill a preexisting obligation are not losses resulting from a wrongful act in breach of that obligation, other payments such as liquidated damages and attorneys fees may likely be. See id. at 568.

Here, the Cotter Complaint sought restitution, injunctive relief, statutory treble damages and attorney's fees and costs. The restitution for gratuities sought in that action arose not from the wrongful act, but the Insureds' pre-existing duty under MASS. GEN. L. c. 149, § 152A:

> If an employer . . . submits a bill, invoice or charge to a patron or other person that imposes a service charge or tip, the total proceeds of that service charge or tip shall be remitted only to the wait staff employees, service employees, or service bartenders in proportion to the service provided by those employees.

Id. § 152A(d).

PIIC argues, however, that the other relief sought, apart from restitution, sought in the Cotter Complaint— the statutory treble damages, attorney's fees and costs—also do not constitute losses under the Policy even if they did result from a D&O Wrongful Act, because these payments are penalties and thus excluded from the Policy's definition of "Loss." However, the statutory provision that provides for these remedies where an employer violates its obligation to remit gratuities under

12

MASS. GEN. L. c. 149, § 152A states that an "employee . . . who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees." MASS. GEN. L. c. 149, § 150. That is, the treble damages allowed by this provision are compensatory, not punitive; they are entirely separate from the scheme of "civil and criminal penalties" set forth in MASS. GEN. L. c. 149, § 27C, which likewise apply to violators of § 152A. MASS. GEN. L. c. 149, § 152A(f); cf. Snapp v. Unlimited Concepts, Inc., 208 F.3d 928, 935 (11th Cir. 2000) (concluding that one provision of the FLSA creates compensatory and not punitive remedies where, inter alia, a separate section provides for punitive sanctions). Moreover, the statutory language expressly identifies the treble damages as compensatory, labeling them "liquidated damages, for any lost wages and other benefits." MASS. GEN. L. c. 149, § 150 (emphasis added). The statute thus identifies the particular losses that the treble damages are intended to redress. Cf. Snapp, 208 F.3d at 934 ("[T]he [FLSA] liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." (quoting Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945)) (internal quotation marks omitted) (first alteration in original)). Attorney's fees and costs are also inherently compensatory; they are intended to make a plaintiff whole after the defendant's wrongful act forced the plaintiff to litigate. See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1347 (Fed. Cir. 2004) (noting the general proposition that attorney's fees "are compensatory"). Accordingly, the non-restitutionary component of the parties' financial settlement would not be excluded as "penalties" from the definition of what constitutes a "Loss" from the Insureds' wrongful act and would be covered under the Policy if no exclusion applied.

### 3. Even if there were Losses from Claims for D&O Wrongful Acts, Coverage Would Still Be Barred by the "Earned Wages" Exclusion

Finally, the parties disagree about whether the "Earned Wages" Exclusion (the "Exclusion"), which applies to claims made under the Policy, excludes coverage. The Exclusion states that "there is no coverage provided under this policy for any Claim related to, arising out of, based upon, or attributable to the refusal, failure or inability of any Insured(s) to pay Earned Wages." Policy, D. 16-5 at 42. The Policy defines "Earned Wages" as "wages or overtime pay for services rendered." Policy, D. 16-5 at 42. This definition makes no express reference to "gratuities." The parties disagree about whether the term "wages" includes the gratuities at issue here.

"The interpretation of an insurance contract is no different from the interpretation of any other contract, and we must construe the words of the policy in their usual and ordinary sense." Hakim v. Mass. Insurers' Insolvency Fund, 424 Mass. 275, 280 (1997). "Any ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured." Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 449 Mass. 621, 628 (2007). This canon of construction "applies with particular force to exclusionary provisions." Hakim, 424 Mass. at 282. "A policy provision will not be deemed ambiguous simply because the parties quibble over its meaning. Rather, a policy provision is 'ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" Certain Interested Underwriters, 680 F.3d at 66 (quoting Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998)). "An insured generally bears the burden of proving that a particular claim falls within a policy's coverage, while an insurer has the burden of proving the applicability of a particular exclusion." Allmerica Fin. Corp., 449 Mass. at 628.

Here, the Policy defines "Earned Wages" to mean, in part, "wages," which is not further

defined. Policy, D. 16-5 at 42. The Insureds argue that "wages" does not incorporate gratuities, and PIIC argues the contrary. In support of its position that wages should be given this "ordinary meaning," PIIC relies upon Black's Law Dictionary, which defines wage as:

> Payment for labor or services, usu. based on time worked or quantity produced; specif., compensation of an employee based on time worked or output of production. Wages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer.

BLACK'S LAW DICTIONARY 1716 (9th ed. 2009). Moreover, the treatment of tips or gratuities as part and parcel of wages is not a novel legal concept. For example, as PIIC notes, in the workers' compensation context, tips are treated as part of a worker's wages. See Case of Gunderson, 423 Mass. 642, 644 (1996) (noting that "[t]he definition of 'average weekly wages' in [MASS. GEN. L. c. 152, § 1] has been construed to give reasonable scope to ascertainable 'earnings': in addition to ordinary salary, earnings have been held to include tips"); see also Flores v. Carnival Cruise Lines, 47 F.3d 1120, 1124 (11th Cir. 1995) (observing that "[a]n overwhelming majority of the courts that have considered this question have determined that tip income is recoverable as part of an individual's 'average weekly wage' under workers' compensation laws"). "Wages" have also included "tips" for the purposes of the Internal Revenue Code. See, e.g., United States v. Fior D'Italia, Inc., 536 U.S. 238, 240 (2002) (employers must pay Social Security taxes "calculated as a percentage of the wages — including the tips — that their employees receive"). Accordingly, it appears that the usual and ordinary meaning of wages in this context would include gratuities. Moreover, the Insureds have offered no rational reason why an insurance policy like the Policy at issue here would treat gratuities, particularly gratuities automatically added to each bill by the Insureds as alleged in the Cotter Complaint, differently from hourly or salaried wages, which are

15

likewise a form of earned employee compensation. As a result of the foregoing, an objectively reasonable insured would understand the term "wages" as used in this Policy to include tips or gratuities. Therefore, the Exclusion excluding coverage for any claims arising out of an insured's failure to pay Earned Wages unambiguously applies in this case and the Insureds are thus not entitled to coverage under the Policy.

Because the Exclusion bars coverage under the Policy for the conduct alleged in the Cotter Complaint, the Insureds are not entitled to a declaratory judgment that PIIC is required to defend and indemnify them under the Policy. Accordingly, PIIC's refusal to defend and indemnify the Insureds did not violate the Policy and does not constitute a breach of contract. The Court grants summary judgment for PIIC on Counts I and II.[3]

### B. PIIC's Motion for Summary Judgment on Count III

"A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d 33, 40 (1st Cir. 2000) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991)). Here, PIIC moves for summary judgment with regards to the Insureds' Chapter 93A claim and argues that the Insureds' complaint alleges, at most, a mere breach of contract claim. As described above, however, the Insureds have not established that PIIC breached the Policy. Moreover, the Court finds no evidence

---

[3] Given the Court's ruling that any coverage under the D&O Wrongful Act is excluded under the "Earned Wages" Exclusion, the Court need not address PIIC's alternative argument that there is no D&O Wrongful Act because the Employment Practice Act carve-out applies. Def. Opp., D. 20 at 9–10. Moreover, to the extent that the Insureds argue that there is coverage under the Employment Practices Liability Insurance of the Policy, Pl. Mot., D. 17 at 10–11, the Court notes that the Earned Wages exclusion also applies to that insurance under the Policy, D. 16-5 at 42, and, accordingly, any coverage under that insurance would also be excluded and the outcome would be the same.

16

suggesting that PIIC's actions derived from anything but a good faith — and correct — interpretation of the Policy. Thus, the Insureds have fallen far short of showing that PIIC's conduct rose "to the level of 'commercial extortion' or a similar degree of culpable conduct." Id. Accordingly, the Court will also enter summary judgment for PIIC on Count III.

## VI. Conclusion

For the foregoing reasons, the Insureds' motion for summary judgment as to Counts I and II is DENIED and PIIC's motion for summary judgment is GRANTED as to all Counts.

**So ordered.**

/s/ Denise J. Casper
United States District Judge